MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2014 ME 130
Docket:        Aro-13-245
Argued:        June 11, 2014
Decided:       November 25, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.
Majority:      SAUFLEY, C.J., and ALEXANDER, SILVER, and JABAR, JJ.
Dissent:       MEAD and GORMAN, JJ.

MARY WALTON

v.

DAVID C. IRELAND JR.

SILVER, J.

[¶1]  David C. Ireland Jr. appeals from an Order of Protection from Abuse entered in the District Court (Presque Isle, *O'Mara, J.*) based upon a finding that Ireland sexually abused the parties' five-year-old daughter.  Ireland argues that the court committed an abuse of discretion by admitting evidence of statements that the victim made to a social worker during play therapy identifying Ireland as her abuser.  Ireland also contends that the court's finding of abuse was clearly erroneous.  We affirm.

I.  BACKGROUND

[¶2]  David Ireland and Mary Walton had an intimate relationship in 2006.  After the relationship ended, Walton learned that she was pregnant.  The parties' daughter was born in December 2006.  About a year later, the court issued an order

allocating parental rights and responsibilities. The order was modified several times. As of October 2012, pursuant to the order, the child lived primarily with Walton and stayed with Ireland every other weekend and for certain extended periods during school vacations. The parties were generally cooperative with one another and had no problems adhering to the visitation schedule. According to Walton, the child began to exhibit reluctance to visit Ireland and would cry hysterically before leaving for visits with him. Nevertheless, Walton encouraged the child to go on the visits.

[¶3] One evening in October 2012, after the child had returned from a visit with Ireland, Walton gave her a bath. While Walton was bathing the child, the child said that it "hurt down there" and pointed to the area of her crotch. Walton asked her why, and the child gave an explanation. Walton brought the child to the emergency room at The Aroostook Medical Center, where doctors examined the child and advised Walton to schedule a forensic child-abuse evaluation at the Spurwink Clinic. The following day, Walton filed an action seeking a protection from abuse order against Ireland on the child's behalf and contacted Spurwink to schedule an evaluation.

[¶4] Over the next several days, the child became upset and expressed fear that Walton no longer loved her. Walton took the child to meet with Cindy Barker, a clinical therapist, to address this behavior. Barker, a licensed clinical social

worker, explained her role to the child in what she considered to be an age-appropriate way, then initiated conversation with the child by asking open-ended questions about her family. The child stated that she did not like going to see her father and that she did not want to see him anymore. During the session, the child repeatedly stated, "he picks at [my] butt and crotch with his fingers and puts his fingers in me," and said that he would then lick his fingers. The child told Barker that she was surprised and confused when her father did this, that it was "really gross," and that she didn't understand why he would do that.

[¶5]  Barker has continued to meet with the child for an hour every other week. Barker described her treatment plan for the child as being to help the child to feel comfortable expressing herself, to work on anxieties and insecurities that have occurred, and to help the child develop coping skills. Barker explained that the content of the child's statements—including the identity of the person she described as abusing her—was important to the treatment plan because it helped Barker to understand the basis for the child's fears and insecurities.

[¶6]  Walton took the child to Spurwink for the sex-abuse evaluation in December 2012. The child met with Donna Andrews, a licensed clinical social worker employed as a forensic interviewer. Andrews's primary purpose in evaluating the child was to determine whether there was evidence that abuse occurred. Andrews asked the child if she knew why she was there; the child

4

responded that she didn't know. During the interview, Andrews asked the child if anyone had done something to her crotch and told her not to tell about it, to which the child responded, "Yes, Dad, but I told anyway." The child gave further descriptions of the abuse consistent with what she had told Barker.

[¶7] A physical examination revealed no evidence of trauma or abuse. Andrews recommended that the child remain in therapy with Barker, that law enforcement and DHHS investigate, and that the child have no contact with her father while the investigation continued. The child did not meet with Andrews again.

[¶8] At the hearing on Walton's complaint for protection from abuse, both Barker and Andrews testified over Ireland's objection as to the statements the child made describing the abuse. The court conditionally admitted the statements but gave the parties the opportunity to brief the issue, indicating that it would strike the testimony from the record if the parties' briefs convinced it that the statements should be excluded.

[¶9] By agreement of the parties, the child, who was then six years old, testified without either party being present in the courtroom.[1] At first, the child testified that she did not know who her "daddy" was, but when asked if she knew

---

[1] The court, after conducting preliminary questioning, concluded that the child was competent to testify. Neither party has challenged that determination on appeal.

anyone named David she identified him as her "dad." When asked how Ireland treated her, the child responded, "Bad." She explained that this was because "he did something wrong," which means "when someone did something bad," but that she had forgotten what the bad thing was. She testified that she did not like going to see her father because he spanked her. She also testified that her father asked her not to talk about "what he did," but that she told her mother anyway. She said that she did not tell anyone else, and that she did not know whether she knew anyone named Cindy Barker. She testified that the only reason she did not want to see Ireland was because he spanked her, and that there was no other reason she did not want to see him.

[¶10] Ireland testified that he occasionally spanked his daughter as discipline. He explained that his daughter usually wanted to change her underwear when she changed into her pajamas, and that at these times he noticed "that her vagina was red and that her rear end was red." Ireland attributed the redness to the child's failure to wipe herself adequately after using the toilet and explained that he applied ointment to treat the redness and irritation. He denied engaging in any conduct with his daughter that could be considered sexual.

[¶11] Following the hearing, the court issued the protection from abuse order against Ireland, finding that Ireland had abused his daughter, ordering that he have no contact with her, and temporarily awarding sole parental rights and

responsibilities to Walton. The court also issued an attachment to the judgment in which it explained that Barker's testimony was admissible pursuant to M.R. Evid. 803(4) because the child's statements, including those identifying her abuser, were pertinent to the diagnosis and treatment of her anxiety and noted that the appellant did not object to Barker's testimony on medical-treatment grounds. The court explained that it had stricken Andrews's testimony because it concluded that the forensic interview had not been undertaken for the purposes of diagnosis or treatment. The court further explained that it found the child's statements to Barker to be more reliable than the child's in-court testimony due to the child's therapeutic relationship with Barker. The court noted that several months had passed since the child had had contact with Ireland and that her testimony indicated that she was unable to remember important facts. Ireland appealed. Walton cross-appealed, contesting the exclusion of Andrews's testimony.

## II. DISCUSSION

### A. Barker's Testimony

[¶12] An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is inadmissible unless an exception applies. M.R. Evid. 801(c), 802. Pursuant to M.R. Evid. 803(4), hearsay statements are not excluded by the hearsay rule if they are "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present

symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." "A trial court's decision to admit or exclude alleged hearsay evidence is reviewed for an abuse of discretion." *State v. Guyette*, 2012 ME 9, ¶ 11, 36 A.3d 916. When the trial court must make preliminary factual findings pursuant to M.R. Evid. 104(a), however, those findings are reviewed only for clear error. *State v. Snow*, 438 A.2d 485, 487 (Me. 1981).

[¶13] We have previously recognized that application of M.R. Evid. 803(4) is not limited to statements made for treatment of physical injuries; it applies to statements made for psychological and mental-health treatment as well.[2] For instance, in the context of a custody dispute, we affirmed the admission of a child's statements to a licensed clinical social worker about why he was afraid of his father. *Ames v. Ames*, 2003 ME 60, ¶ 16, 822 A.2d 1201. In that case, the parties' six-and-a-half-year-old son began "displaying problems with concentration, sleep, anger, fear, and stomachaches" and refused to visit his father. *Id.* ¶¶ 2, 4. The mother sought the advice of a licensed clinical social worker who "hoped to

---

[2] A number of federal courts have also recognized that the exception in Fed. R. Evid. 803(4), which is substantively identical to M.R. Evid. 803(4), applies to statements made for the purpose of psychological or mental-health treatment. *See, e.g., Morgan v. Foretich*, 846 F.2d 941, 948-50 (4th Cir. 1988) (applying rule to child's statements to a psychologist concerning sexual abuse); *United States v. Kappell*, 418 F.3d 550, 556-57 (6th Cir. 2005) (applying rule to child's statements to a psychotherapist); *United States v. Yellow*, 18 F.3d 1438, 1442 (8th Cir. 1994) (explaining that the Eighth Circuit has "consistently upheld the admission of statements made to psychologists or trained social workers" that otherwise meet the rule's requirements).

address the child's concerns and help him become comfortable with his father." *Id.* ¶ 5. The child told the social worker that he was afraid of his father and that it was the child's idea to stop visitation. *Id.* At trial, the social worker testified about the child's statements that he was afraid of his father and did not want to visit him. *Id.* ¶ 7. We explained that the child's statements to the social worker "explained the source of his fear" and concluded, "Given that the purpose of the treatment was to identify the cause of his fear and overcome it, this statement was pertinent to his diagnosis and treatment and [was] properly admitted." *Id.* ¶ 16.

[¶14] Similarly, we held that a nurse practitioner's diagnosis of a young woman's "depression, anxiety, and situational stress secondary to emotional abuse by [her] boyfriend" was admissible at the boyfriend's trial for the woman's subsequent murder. *State v. Cookson*, 2003 ME 136, ¶¶ 18, 26, 837 A.2d 101. In that case, the woman told the nurse practitioner that she was depressed because her boyfriend had been stalking and harassing her. *Id.* ¶¶ 18-19. We held that the nurse practitioner's testimony about these statements was admissible pursuant to M.R. Evid. 803(4) because "[the victim's] statements to the nurse about having a problem with Cookson and about Cookson following and stalking her were made to describe to the nurse the external source of her depression." *Id.* ¶ 26. We further explained that "[the victim's] statements were also pertinent to her

treatment, including the provision of antidepressant drugs, given by the nurse practitioner." *Id.*

1. The Reliability of the Statements

[¶15] Ireland argues that the child's statements to Barker should have been excluded because they lacked the indicia of reliability typically associated with statements made for the purpose of securing medical treatment. The reliability of a hearsay statement, however, goes to its weight, not its admissibility; it is a matter for the fact-finder to consider in its evaluation of all the evidence, and not for the court to consider in determining the admissibility of the statement. *See Handrahan v. Malenko*, 2011 ME 15, ¶¶ 19-20, 12 A.3d 79 (concluding that the fact-finder "was justified in [its] assessment of the reliability of the child's out-of-court statement" where the child was not shown to have a "strong motivation . . . to be entirely honest with her physician for purposes of medical diagnosis and treatment" (quotation marks omitted) (alteration omitted)); Field & Murray, *Maine Evidence* § 803.4 at 479 (6th ed. 2007) (explaining that a statement's "trustworthiness is less when the purpose is [for diagnosis only rather than] for treatment, but this goes to its weight rather than its admissibility"); *see also Danaipour v. McLarey*, 386 F.3d 289, 297-98 (1st Cir. 2004) (holding that a mother's statements to a medical provider describing two young children's disclosures of sexual abuse were admissible pursuant to Fed. R. Evid. 803(4) and

10

observing that "[t]he [fact-finder] carefully considered the fact that statements by a young child, even if accurately recounted by an adult, may not reflect the truth"); *United States v. George*, 960 F.2d 97, 100 (9th Cir. 1992) ("As a general matter, the age of the child and her other personal characteristics go to the weight of the hearsay statements rather than their admissibility.") Absent a change to the rules of evidence, we decline to require an additional showing of reliability for hearsay statements that fall within the Rule 803(4) exception.[3]

[¶16] Although the trial court did not explicitly find that the statement was made for the purpose of medical diagnosis or treatment, we must assume that it made this preliminary finding. *See Pelletier v. Pelletier*, 2012 ME 15, ¶ 20, 36 A.3d 903 ("In the absence of a motion for additional findings of fact . . . we will infer that the trial court made any factual inferences needed to support its ultimate conclusion."). The trial court's implicit finding concerning the purpose of the child's statements was supported by Barker's testimony that she explained her role to the child and that the child's statements were important for developing a treatment plan. The court acted well within its role as fact-finder by inferring the purpose of the child's statements. *See Snow*, 438 A.2d at 487-88 (explaining that the fact-finder is permitted to draw reasonable inferences in making a finding

---

[3] Because this is not a criminal case, we do not address whether the Confrontation Clause may require additional guarantees of trustworthiness for the admission of hearsay statements in criminal prosecutions. *See Handrahan v. Malenko*, 2011 ME 15, ¶ 16 n.4, 12 A.3d 79.

preliminary to the admission of evidence). The child was sent to the therapist because her mother was concerned about the child not feeling loved, and Barker's goal was to treat the child for anxiety. Although these facts could arguably support a finding that the statements were not made for purposes of diagnosis or treatment, on this record we cannot conclude that the trial court's preliminary factual determination constituted clear error. *See id.* at 487 ("Use of the clearly erroneous test to review the trial judge's preliminary finding of fact recognizes the superior opportunity that he enjoyed to hear the evidence as it was presented through live witnesses . . . ." (quotation marks omitted)).

2.    The Pertinence of the Perpetrator's Identity to Diagnosis or Treatment

[¶17]    Ireland's primary contention is that the portions of the child's statements identifying Ireland as her abuser were not pertinent to diagnosis or treatment because they served "merely [to] affix fault or blame." *See State v. Sickles*, 655 A.2d 1254, 1257 (Me. 1995). "Pertinence, within the contemplation of Rule 803(4), is an objective consideration beyond the declarant's state of mind." *Id.* (quotation marks omitted). "Pertinence may be tested by asking whether the information is of a type on which a physician could reasonably rely to form a diagnosis or provide treatment." *Id.*

[¶18]  In many cases, extraneous details of an assault, including the identity of the perpetrator, may not be pertinent to medical diagnosis or treatment. For

12

instance, in a case in which a victim described the time and location of an alleged rape and identified her brother as the perpetrator, we concluded:

> That it was intercourse that caused [the victim] to see the doctor and that it occurred the previous evening are facts reasonably pertinent to the diagnosis and treatment . . . . But the identity of the perpetrator and the scene of the alleged rape do not fall within that hearsay exception.

*State v. True*, 438 A.2d 460, 467 (Me. 1981). Similarly, we concluded that hearsay statements describing medically irrelevant details of a sexual assault, such as that the victim "asked that it stop," were improperly admitted pursuant to M. R. Evid. 803(4) where the testifying physician's "role in examining the victim was limited to providing emergency room care" and the doctor "did not indicate whether or how the knowledge that the victim may have 'asked that it stop' helped her in her diagnosis." *Sickles*, 655 A.2d at 1257.

[¶19] We have concluded, however, that certain details that may not be relevant to treatment for physical injuries may be pertinent to treatment for emotional or psychological trauma. For instance, we determined that a sexual-assault victim's statement to a doctor that she had been threatened with a knife "pertained to the emotional trauma that the physician was . . . addressing" where "the physician prefaced his remark by saying that the emotional ramifications of rape are a significant part of the victim's problem in relation to treatment." *State v. Rosa*, 575 A.2d 727, 729 (Me. 1990). Similarly, in *Ames*, we

determined that a young child's statement that he was afraid of his father was pertinent to diagnosis and treatment "[g]iven that the purpose of the treatment was to identify the cause of his fear and overcome it . . . . " 2003 ME 60, ¶¶ 14, 16, 822 A.2d 1201.

[¶20] Here, Barker testified that the identity of the child's abuser was important for developing a treatment plan for the child. Under these circumstances, as in almost any case involving a child who is abused by a family member, the identity of the perpetrator may indeed be pertinent to diagnosis and treatment. *See Danaipour*, 386 F.3d at 297 ("Child therapists routinely, as part of their diagnosis or treatment, obtain the type of statements made by the patients here . . . about the identity of the perpetrator of the abuse. . . . [Such statements] are usually reasonably pertinent to treatment of the child."); *United States v. Joe*, 8 F.3d 1488, 1494 (10th Cir. 1993) ("[W]here the abuser is a member of the family or household, the abuser's identity is especially pertinent to the physician's recommendation regarding an appropriate course of treatment . . . . "); *Morgan v. Foretich*, 846 F.2d 941, 949-50 (4th Cir. 1988) ("[A] physician in determining treatment may rely on factors in child abuse cases such as an assailant's identity that would not be relied on were the patient an adult."); *United States v. Renville*, 779 F.2d 430, 437 (8th Cir. 1985) ("The exact nature and extent of the psychological problems which ensue from child abuse often depend

on the identity of the abuser."). The trial court did not abuse its discretion by admitting evidence of the statements the child made to Barker identifying Ireland as her abuser.

B.    Andrews's Testimony

[¶21]    Walton argues that the court abused its discretion by excluding Andrews's testimony. Because Walton obtained a favorable result in the trial court, and we affirm the court's opinion, we would not ordinarily reach this issue. *In re Johnna M.*, 2006 ME 46, ¶ 7, 903 A.2d 331; *see also Storer v. Dep't of Envtl. Prot.*, 656 A.2d 1191, 1192 (Me. 1995); *Ullis v. Town of Boothbay Harbor*, 459 A.2d 153, 155-56 (Me. 1983). Nevertheless, we note that the court did not commit an abuse of discretion by excluding Andrews's testimony based on its conclusion that the forensic interview was not undertaken for the purpose of diagnosis or treatment. Andrews's role was to collect and assess evidence of abuse. When an interview is conducted primarily for the purpose of collecting evidence and determining whether abuse occurred, the court may conclude that statements made during that interview are not made for purposes of diagnosis or treatment. *See* M.R. Evid. 803(4); *Handrahan*, 2011 ME 15, ¶ 16, 12 A.3d 79 (observing that, where the interviewer "conducted a forensic interview of the child in her capacity as co-director of the Spurwink Child Abuse Program" it was "not clear that the child's statements . . . were made for purposes of medical diagnosis

or treatment"). The court did not abuse its discretion by excluding evidence of statements the child made during the forensic interview.

C.     The Court's Finding of Abuse

[¶22]  A plaintiff seeking an order for protection from abuse must prove by a preponderance of the evidence that the defendant abused the plaintiff. 19-A M.R.S. § 4006(1) (2013).  We review a trial court's finding of abuse for clear error "and will affirm a trial court's findings if they are supported by competent evidence in the record, even if the evidence might support alternative findings of fact."  *Handrahan*, 2011 ME 15, ¶ 13, 12 A.3d 79 (quotation marks omitted); *see also Jacobs v. Jacobs*, 2007 ME 14, ¶ 5, 915 A.2d 409.

[¶23]  Ireland argues that the court's finding of abuse was clearly erroneous because the child, during her in-court testimony, effectively denied that any abuse had occurred.  Ireland contends that the court was required to accept the child's testimony as being more reliable than the statements she made to Barker.  This contention is unpersuasive.  "No principle of appellate review is better established than the principle that credibility determinations are left to the sound judgment of the trier of fact."  *Weinstein v. Sanborn*, 1999 ME 181, ¶ 3, 741 A.2d 459. Moreover, we have previously held that a child's out-of-court statements provide sufficient evidence to support a finding, by a preponderance of the evidence, of abuse, even when the child testifies that the abuse did not occur and that he does

16

not remember making the earlier statement describing the abuse. *In re Charles Jason R., Jr.*, 572 A.2d 1080, 1081-82 (Me. 1990).

[¶24] Here, the trial court explained that it found the child's statements to Barker to be more credible than the child's in-court testimony. *See White v. Illinois*, 502 U.S. 346, 355-56 (1992) ("[F]actors that contribute to the statements' reliability cannot be recaptured even by later in-court testimony. . . . [A] statement made in the course of procuring medical services . . . carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony."). The court found the child's testimony to be confusing and contradictory and also noted the child's inability to recall certain basic facts during her testimony. Because credibility determinations are exclusively within the province of the fact-finder, Ireland's contention that the child's testimony must be given more weight than the statements she made to her therapist is unavailing. *See In re Charles Jason R., Jr.,* 572 A.2d at 1081 ("Once admitted and relied upon by the court, [the child's out-of-court] statement amply supported the court's finding [of abuse] by a preponderance . . . ."). The evidence was sufficient to support the court's finding of abuse by a preponderance of the evidence.

The entry is:

> Judgment affirmed.

---

MEAD, J., with whom GORMAN, J., joins, dissenting.

[¶25] I respectfully dissent from the Court's conclusion that the daughter's identification of Ireland as the person who inappropriately touched her falls within the hearsay exception created by Rule 803(4) of the Maine Rules of Evidence. While I do not disagree with the Court's recitation of the broad principles that govern the application of Rule 803(4), I conclude that the evidentiary record does not provide a sufficient foundation for the admission of these statements.

[¶26] Rule 803(4) provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . .
>
> (4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

The rule establishes two separate and distinct points of inquiry: (1) did the declarant make the statements with the subjective purpose of obtaining a medical diagnosis or treatment? and (2) was the information pertinent to diagnosis or treatment? The Court focuses only on the second inquiry. I would hold, however, that both questions must be answered in the affirmative, based upon evidence in the record, before such statements are admissible as exceptions to the hearsay rule.

[¶27] Here, the second of the two inquiries required the court to determine whether the identity of the child's abuser was pertinent to diagnosis or treatment. The record compellingly establishes that it was. Any treatment plan for a victim of child sexual abuse will certainly include a strategy for protecting the child from further abuse by that person. Expert testimony in the record establishes the element of pertinence to diagnosis or treatment without doubt. *See State v. Sickles*, 655 A.2d 1254, 1257 (Me. 1995) ("Pertinence, within the contemplation of Rule 803(4), is an objective consideration beyond the declarant's state of mind." (quoting *Cassidy v. State*, 536 A.2d 666, 686 (Md. Ct. Spec. App. 1988))).

[¶28] The first of the two inquiries—whether the statements were made for the purposes of medical diagnosis or treatment—necessarily calls into issue the subjective state of mind of the declarant. This critical subjective element is the raison d'être of the Rule 803(4) exception. As the Advisor's Notes indicate: "The justification [for the exception] is the patient's strong motivation to be truthful."

M.R. Evid. 803(4) Adviser's Note; s*ee also Meaney v. United States*, 112 F.2d 538, 539-40 (2d Cir. 1940) (Hand, J.) ("A man goes to his physician expected to recount all that he feels, and often he has with some care searched his consciousness to be sure that he will leave out nothing. . . . because his treatment will in part depend upon what he says."). Some courts do not engage in such an inquiry and limit the focus of their analysis only on whether the treating physician deems a statement pertinent to treatment. *See, e.g.*, *Stallnacker v. State*, 715 S.W.2d 883, 884 (Ark. App. 1986). Others, however, conclude that Rule 803(4) requires consideration of the unique circumstances of each case relating to the patient's motivation. *See, e.g.*, *Cassidy v. State*, 536 A.2d 666, 678 (Md. Ct. Spec. App. 1988) ("[N]o one would willingly risk medical injury from improper treatment by withholding necessary data or furnishing false data to the physician who would determine the course of treatment on the basis of that data."); *United States v. Peneaux*, 432 F.3d 882, 894 (8th Cir. 2005) ("The motive requirement means that the victim must have had a selfish subjective motive of receiving proper medical treatment or the state of mind of someone seeking medical treatment." (quotation marks omitted)).

[¶29] Common sense, and the principles underlying the Rule 803(4) exception, require the approach articulated in *Cassidy* and *Peneaux*. If a person seeks medical treatment for a particular condition, it is likely that he will be

truthful with the caregiver when describing the nature or source of his complaints. *Meaney*, 112 F.2d at 539-40. As with other hearsay exceptions, the circumstances of such statements create an independent basis for truthfulness. We have not previously directly addressed the Rule 803(4) element of the declarant's subjective purpose in making statements to medical providers. Our existing jurisprudence focuses upon the pertinence element; the declarant's subjective purpose for the statements in those cases is obvious from the context of those statements. Today, the Court clarifies that both the purpose element and the pertinence element must be established by the proponent of the statement, and determines that Walton has successfully done so.

[¶30] In discerning whether the declarant, when making specific statements to a health care provider, made those statements with the specific purpose of obtaining a diagnosis or treatment, it is necessary for the court to consider the circumstances of the statements and the declarant's subjective state of mind. In the typical instance of an adult who sincerely seeks medical attention for a particular condition, the analysis is ordinarily quite straightforward. The declarant's purpose is obvious from the context of the medical consultation. In those matters, the 803(4) analysis quickly turns to the pertinence element.

[¶31] When a child is communicating with a health care provider, however, the "purpose" question becomes more complex and nuanced. Children do not

generally seek medical care. Although a child may report a condition or symptom to a parent or others, it is usually an adult who seeks the care on the child's behalf. The fact that an adult brings a child to a provider for the purpose of diagnosis or treatment does not create greater likelihood that the child's statements to the medical care provider will be truthful.[4] A child may not understand the importance of giving an accurate history to the medical care provider. Unless the evidentiary record establishes that the child had an understanding of the connection between truthful reporting and meaningful diagnosis and treatment and gave the information with the subjective purpose of giving such truthful information, the critical foundation for Rule 803(4) is lacking.

[¶32] Walton took her daughter to the Life by Designs facility for "play therapy" with Cindy Barker, who holds a certification as a Licensed Master Social Worker, Clinical Conditional.[5] Walton cites as a reason for this action that, "She [the daughter] was saying that I don't love her anymore. She was upset. She wasn't the same little girl." Walton further testified that the professionals at the Spurwink Center recommended that she continue to have her daughter attend the play therapy sessions with Cindy Barker.

---

[4] Arguably, the opposite may occur. A child, who may fear the doctor or medical setting, may be more likely to deny, minimize, or misstate circumstances to discourage further medical attention.

[5] I note, but do not address, the issue of whether a play therapist makes a "medical diagnosis" or provides "medical treatment" as those terms are used in the rule.

[¶33]   The record is devoid of any basis for a court to conclude that any of the daughter's statements to Ms. Barker resulted from any subjective purpose on the daughter's part to obtain diagnosis or treatment.  Stated otherwise, the court had utterly no way of knowing what, if anything, the daughter thought the play therapy sessions were intended to accomplish or why it would be important to tell the truth.  The only testimony in the record that remotely addresses the daughter's perceptions of the sessions is the testimony of Ms. Barker that, "I just—I introduced myself to her.  Just kind of explained in an age-appropriate way my role, what I do.  I work with kids.  I talk to kids."  This testimony provides no insight into the daughter's perceptions, particularly when the testimony does not relate what was actually said.

[¶34]   The fact that a parent may have a purpose in taking a child to a treatment facility does not translate into a subjective intent of the child—the declarant—to make statements for the purposes of diagnosis or treatment.  The law provides no basis for a parent's purpose to be imputed to the child.  Accordingly, I would conclude that the admission of the out-of-court statements by the child to Ms. Barker was erroneous.[6]  The trial court simply cannot conclude that a declarant

---

[6] Although the Rule 803(4) element of purpose was not emphasized by the parties at the trial level, it must be addressed expressly or impliedly by a trial court before admitting a hearsay statement as a statement made for purposes of medical diagnosis or treatment.  The trial court here did address the issue of purpose in its decision, but conflated it with the element of pertinence.

had a particular subjective intent in making statements for purposes of medical diagnosis and treatment when the record contains absolutely no evidence, and allows no reasonable inference, of such.

[¶35] I do not suggest that a child's statements to a medical care provider require greater indicia of reliability than those that would be required of an adult's out-of-court statements. Rather, the proof regarding the circumstances of the statements—by an adult or a child—simply must be sufficient to establish a basis for a court to conclude that the declarant made them with the purpose of obtaining meaningful diagnosis or treatment.[7] In the complete absence of such evidence, the foundation for Rule 803(4) is lacking, and the statements do not qualify as exceptions to the hearsay rule. Accordingly, I would vacate and remand for the court to determine whether the plaintiff met her burden of proof in the absence of these statements.

---

[7] A colloquy, such as the following, would likely be sufficient:

Q: Why were you seeing [the counselor]?

A: Because I was [sad/mad/scared].

Q: Did you think talking to her about why you were [sad/mad/scared] would help?

A: Yes.

24

**On the briefs:**

Logan Perkins, Esq., and Jeffrey M. Silverstein, Esq., Bangor, for appellant David C. Ireland Jr.

James M. Dunleavy, Esq., Currier and Trask, P.A., Presque Isle, for appellee Mary Walton

**At oral argument:**

Logan Perkins, Esq., for appellant David C. Ireland Jr.

James M. Dunleavy, Esq., for appellee Mary Walton

Presque Isle District Court docket number PA-2012-211
FOR CLERK REFERENCE ONLY